IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 12, 2021 Session

**IN RE JAMES W., ET AL.**

**Appeal from the Juvenile Court for Anderson County**
**No. J30729, J30730, J30731          Brian J. Hunt, Judge**

_____

**No. E2020-01440-COA-R3-PT**

_____

This case involves a petition to terminate parental rights. The petition was filed by the Department of Children's Services against the biological mother of several minor children. In the petition, the Department alleged five grounds for termination: (1) abandonment by failure to provide a suitable home; (2) abandonment by exhibiting a wanton disregard for the welfare of the children prior to incarceration; (3) substantial noncompliance with a permanency plan; (4) persistence of conditions; and (5) failure to manifest an ability and willingness to parent. After a trial on the petition, the trial court found that the Department established all five grounds and that termination was in the best interest of the children. As a result, the trial court terminated the mother's parental rights. We affirm the trial court's decision and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

L. Rosillo Mulligan, Harriman, Tennessee, for the appellant, Jennifer L.[1]

Herbert H. Slatery, III, Attorney General and Reporter; and Amber L. Seymour, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

_____

[1] In actions involving a juvenile, this Court's policy is to protect the privacy of the child by using only the first name and last initial of the parties involved. *See In re C.W.*, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

# I. FACTS AND PROCEDURAL HISTORY

Jennifer L. ("Mother") is the biological mother of James W. (who goes by Greg), Tyler W., and Reagan L. (collectively "the children"). Greg was born in 2003;[2] Tyler was born in 2005; and Reagan was born in 2008. James L.W. is the biological father of Greg and Tyler. Scotty L. is the biological father of Reagan. This appeal involves a petition to terminate Mother's parental rights to the children. Although the Department of Children's Services ("DCS") originally filed the petition against all three parents, this appeal only involves Mother's parental rights.

DCS has been involved with Mother and the children since 2006. Since 2006, DCS has received several referrals regarding Mother and the children. The referrals often alleged that Mother and Scotty were abusing drugs or that Mother was providing inadequate care for the children. These referrals prompted subsequent investigations by DCS, which led to multiple periods where the children were placed in the custody of DCS.

The children first entered DCS custody on October 9, 2012. At that time, Mother was unavailable to care for the children due to her being in an inpatient rehabilitation facility. On June 25, 2013, the juvenile court determined that Mother was no longer unable to care for the children, so the children reentered her custody. Although the children returned to Mother's custody, DCS continued to receive referrals regarding the children in 2015 and 2016.

The referrals in 2015 and 2016 alleged that Mother was abusing drugs and failing to provide adequate care for the children. As a result, on July 8, 2016, the juvenile court placed the children back into DCS custody. During this custodial episode—from July 2016 to December 2017—DCS coordinated with Mother to draft multiple Family Permanency Plans. Family service worker Michelle Weitzel ("FSW Weitzel") was the DCS worker assigned for the family. Throughout the custodial episode, FSW Weitzel provided several services for Mother to help assist her in regaining custody of the children. Her assistance included providing drug and alcohol and mental health assessments, arranging therapeutic visits between Mother and the children, providing transportation for the visits, assisting Mother in obtaining housing, helping develop the permanency plans, and maintaining regular contact with Mother. Eventually, the juvenile court determined that Mother was in substantial compliance with the permanency plans and returned the children to her custody.

The children began transitioning back into Mother's custody in July 2018, approximately two years after they reentered DCS custody. Reagan returned to Mother's custody in July 2018. Tyler and the oldest sibling of the children, Tasha, who is not a

---

[2] Although Greg has reached adulthood, because Mother's parental rights to Greg were terminated by the trial court, we shall review termination of those rights in this appeal. *See In re Jeremy C.*, No. M2020-00803-COA-R3-PT, 2021 WL 754604, at *6 n.5 (Tenn. Ct. App. Feb. 26, 2021).

subject of this appeal, reentered Mother's care in August 2018. Greg returned to Mother's care in October 2018.[3] Initially, Mother was compliant with DCS and the juvenile court's directives. However, shortly after the children's return, Mother reverted back to a tumultuous and unstable lifestyle.

At the time Greg returned to Mother's custody, Mother was maintaining a residence for herself and the children. A few months after Greg's return, Mother was evicted from the residence for failing to pay rent. After being evicted, Mother obtained temporary housing for approximately one month before moving into another rental property. Shortly thereafter, Mother had a "falling out" with the property's landlord and left the residence. With no other housing options, Mother and the children moved in with a friend of Mother's.

Although the children had returned to Mother's care, DCS continued to provide services and other assistance for the family. When Mother was having difficulties finding a residence, DCS helped Mother obtain temporary housing. In December 2018, DCS helped provide toiletries, food, and Christmas gifts for the children. In March 2019, DCS received another referral regarding Mother's care for the children and conducted a meeting with the family. At the meeting, DCS screened Mother and Greg for drugs. Mother and Greg (who was sixteen years old at the time) both tested positive for THC. As a result of Mother's positive test, DCS provided Mother with resources to attend narcotics anonymous meetings.

Mother had previous criminal charges, including reckless endangerment, probation violations, and failing to appear before the court. On May 27, 2019, Mother was arrested and incarcerated for failing to appear and for violating the terms of her probation. On June 12, 2019, due in part to Mother's unavailability, the children were removed from Mother's custody. The children reentered DCS custody due to Mother's incarceration, her drug use, and her inability to transport the children to school, causing educational neglect. Greg and Tyler were placed together in one foster home, while Reagan was placed in a separate foster home. Mother remained incarcerated until June 21, 2019.

FSW Weitzel helped develop a new Family Permanency Plan for Mother after the children reentered DCS custody. This new plan was drafted in early July 2019. The primary focus of the plan was for Mother to abstain from further substance abuse. The goals of the plan were for the children to return to Mother's custody, to exit DCS custody with a relative, or to be adopted. The plan included several responsibilities for Mother. The responsibilities required Mother to complete a mental health assessment, submit to random drug screens, remain compliant with the Roane County Drug Court, resolve her pending criminal charges and comply with court orders, maintain a legal source of income, maintain a bond with the children by completing supervised visitation, and provide a

---

[3] DCS suggested that the children's return should be staggered to ensure that Mother was not "overwhelmed" by their return.

written transportation plan to DCS. In conjunction with FSW Weitzel, Mother participated in the development of this permanency plan. The juvenile court ratified the plan on August 8, 2019.[4]

Following Mother's release from incarceration, in June 2019, she was accepted into the Roane County Recovery Court program. As part of the program, Mother began receiving outpatient drug and alcohol treatment through WestCare Tennessee. Initially, Mother was successful in the program, completing its requirements and consistently passing drug screens. Mother was incarcerated for a period of four days in early August.[5] Although Mother missed treatment appointments in July and early August 2019, from June 25 to August 22, 2019, Mother was subject to seventeen drug screens. Mother passed all seventeen screens during this period. However, on August 27, 2019, Mother failed a drug screen by testing positive for methamphetamine, Suboxone, and synthetic marijuana.

When Mother tested positive for illicit substances in August 2019, she was informed that she would be incarcerated until an opening at an inpatient drug rehabilitation facility became available. Upon learning that she would be incarcerated, Mother immediately "went on the run" from authorities. While Mother was "on the run," FSW Weitzel attempted to locate her by conducting physical searches, gathering information from nearby family members, searching local jail sites, and searching for her whereabouts on the internet. Eventually, on October 29, 2019, Mother was apprehended and incarcerated.

Mother remained incarcerated until she was admitted into Abundant Hope Ministries, an inpatient drug rehabilitation facility. Mother entered Abundant Hope on December 9, 2019. Upon entering Abundant Hope, Mother began a twelve-month drug rehabilitation program. At the time of trial in this case, Mother continued to reside at Abundant Hope.

On January 10, 2020, approximately seven months after the children last entered DCS custody, DCS filed a petition to terminate Mother's parental rights to the children. In the petition, DCS alleged five grounds for termination: (1) abandonment by failing to provide a suitable home; (2) abandonment by exhibiting a wanton disregard for the welfare of the children prior to incarceration; (3) substantial noncompliance with the permanency plan; (4) persistence of conditions; and (5) failure to manifest an ability and willingness to parent.

On August 13, 2020, the trial court held a final hearing on the termination petition. Several witnesses testified at the hearing, including Mother, FSW Weitzel, Greg and

---

[4] After DCS initiated the present action, the permanency plan was revised on February 7, 2020. The revised permanency plan adjusted the deadlines for certain responsibilities but included the same responsibilities for Mother as the original plan. It was ratified by the trial court on March 3, 2020.

[5] The record is not clear as to the reason for Mother's incarceration during this time.

Tyler's foster parent, and employees at Abundant Hope. Greg and Tyler also testified.

Mother testified on the family's involvement with DCS, her history of drug use, her efforts to change her lifestyle, and her relationship with the children. Mother verified that the children were in DCS custody on two prior occasions before June 2019. Mother stated that from 2015 up to the date of trial, the family has received continuous assistance from DCS. Mother testified that DCS helped her move into a new residence on one occasion by providing funds for a deposit and by helping her obtain furniture. Mother also stated that DCS has arranged for various services and therapy for the children. Despite the assistance provided by DCS, Mother's drug use and unstable lifestyle continued to persist.

Mother explained that she worked successfully with DCS during the children's initial stint in DCS custody. During that time, Mother made progress on the then-controlling permanency plan, which enabled her to regain custody of the children. Despite her progress, the children reentered DCS custody in July 2016. Mother claimed that during this custodial episode she again corrected her lifestyle to allow the children to return. Mother claimed that she was no longer using drugs when the children reentered her custody in 2018. Despite Mother's efforts, she continued to have difficulties maintaining a permanent home for the children.

Mother also detailed the family's living arrangements after she regained custody of the children. She testified that after Greg returned in October 2018, the family changed residences several times. When Mother was incarcerated in May 2019, the family was without a home of their own and living with a friend of Mother's. After Mother was released from incarceration in June 2019, she entered the Roane County Drug Court program. Initially, Mother was successful in this program and making progress. However, Mother claimed that her participation in the program began "going downhill" when Scotty was released from incarceration.

A significant amount of Mother's issues transpired when she resided or associated with Scotty. She testified that she married Scotty in 2010. Despite court orders that barred Scotty from living with Mother and the children, Mother admitted that he continued to live with the family while the children were in her custody. Mother stated that she frequently used illegal drugs with Scotty and, at times, would share her prescription medication with Scotty. Mother claimed that her substance abuse issues worsened around Scotty. After Scotty was released from incarceration in July 2019, Mother began failing her drug screens and missing appointments with WestCare. Mother stated that she was using methamphetamine and Suboxone with Scotty in August 2019. Although Mother and Scotty are still married, Mother testified that she does not intend to return to Scotty.

Although Mother struggled with drug abuse in the past, she claimed that her circumstances have changed since she entered Abundant Hope in December 2019. Mother testified that Abundant Hope has helped her refrain from using drugs. She praised the

assistance provided by Abundant Hope and stated that she has successfully progressed through its program. As of trial in August 2020, Mother stated that she would soon enter the "upper phase" of Abundant Hope's program. She explained that in the "upper phase" of the program she would be allowed to seek a residence and employment. Mother stated that she was scheduled to graduate the program in December 2020. She explained that Abundant Hope helped her establish a budget plan and locate potential housing and employment. Despite this assistance, at the time of trial, Mother was not earning an income, she was on a three-month waiting list for an apartment, and she relied on family members to provide a deposit for the apartment.

Mother further testified on her relationship with the children. She stated that she and the children share an "amazing relationship." She claimed that since she entered Abundant Hope, she has maintained regular contact with the children by telephone and video calls. She also stated that prior to the COVID-19 pandemic, she was visiting the children once per week. Mother commended Greg and Tyler's foster father, stating that he "is an amazing person" and always ensures that she maintains contact with the boys. Mother stated that she is willing to allow Greg and Tyler to remain with their foster father and that her "main focus" is on becoming reunified with Reagan. Mother explained that the foster father is taking quality care of Greg and Tyler and that she believes that she can provide adequate care for one child.

FSW Weitzel also testified at the final hearing. FSW Weitzel testified as to her efforts to assist Mother and the children, Mother's progress since she first started working with the family, and the children's current wellbeing. FSW Weitzel stated that she provided an extensive amount of support for the family during the children's custodial episode between 2016 and 2018. She also stated that she made additional efforts to assist the family directly after the children returned to DCS custody in June 2019. FSW Weitzel stated that during the current custodial episode she helped arrange drug screens for Mother, arranged therapeutic visitations, helped Mother locate housing, and held meetings with the family to identify potential needs. FSW Weitzel also stated that she helped develop the Family Permanency Plan that was drafted on July 10, 2019. In addition to the efforts that she made to help reunify the family, FSW Weitzel also testified on Mother's efforts after she was released from incarceration in June 2019. She stated that between June 12 and October 12, 2019, Mother completed two visits with the children. She also stated that Mother would attend family meetings by phone and that Mother maintained contact until she failed a drug test in August 2019. She further testified that Mother did not make efforts to locate housing during this four-month period.

Additionally, FSW Weitzel testified that she doubted Mother's ability to remain sober and care for the children. FSW Weitzel testified that prior to her incarceration in June 2019, Mother continued to engage in criminal conduct and abused drugs. She also stated that, as of trial, Mother had not completed parenting classes, that she had not obtained housing or an income, and that she had not obtained reliable transportation. On

the day of trial, Mother provided a transportation plan.  However, she was still without a car and was planning to rely on other means of transportation, such as public transit or a family member.  FSW Weitzel questioned Mother's ability to maintain her sobriety.  She stated that Mother was doing well in Abundant Hope's controlled environment, but that Mother has a history of returning to drug use when she is not in a treatment program. Similarly, FSW Weitzel stated that Mother has previously stated that she planned to leave Scotty but that Mother would inevitably return to his company.

FSW Weitzel gave extensive testimony on the children since they last entered DCS custody.  Upon reentering DCS custody, Greg and Tyler were placed with a DCS foster father.  Reagan was placed in a separate foster home.  FSW Weitzel stated that Greg and Tyler are thriving in their placement and that both are bright and respectful and desire to finish school.  FSW Weitzel further testified that Greg and Tyler receive individual therapy and medication management. Greg also receives child and family therapy.  Similarly, FSW Weitzel stated that Reagan is thriving in her foster home.  According to FSW Weitzel, Reagan is excelling in school, has lots of friends, enjoys receiving therapy, and gets along well with her foster family.  Although Reagan is placed in a separate foster home than the boys, FSW Weitzel stated that Reagan regularly visits and maintains contact with Greg and Tyler.  FSW Weitzel explained that Reagan was placed in a separate foster home, in part, because Reagan required a higher degree of care than Greg and Tyler.  She also testified that despite their separation from Mother, the children have maintained a loving bond with Mother.

Greg and Tyler's foster father also testified.  The foster father confirmed that Greg and Tyler were doing well in his care.  He stated that the boys are performing well in school, do not have any abnormal behavior issues, and are becoming responsible and mature.  The foster father stated that he ensures the boys maintain frequent contact with Mother.  The foster father expressed his willingness to care for the boys as long as may be necessary.  He also explained that, when the children reentered DCS custody, he had reservations with caring for Reagan because he did not have experience caring for a girl.

Various employees at Abundant Hope testified during Mother's case-in-chief. Corey Letterman, the Executive Director at Abundant Hope, testified that Mother is on track to enter the last phase of a twelve-month rehabilitation program.  He explained that in the last phase, Mother will be allowed to look for employment, search for a residence, and seek to regain custody of the children.  Mr. Letterman testified that since Mother entered Abundant Hope, she has passed all drug screens and has shown a willingness to overcome her drug addiction.  Amy Surber, Mother's counselor at Abundant Hope, confirmed that Mother has been successful at Abundant Hope.  She stated that she has assisted Mother in completing housing and job applications.  According to Ms. Surber, Mother is on a one-to-three-month waiting list for a home.

The final witnesses that testified at the final hearing were Greg and Tyler.  Greg

stated that his and Tyler's foster father provides a quality home but that, if possible, he wishes to return to Mother. Similarly, he does not wish to be adopted. Greg testified that in the past he has seen Mother "strung out on drugs" but that he believes she is making progress at Abundant Hope. Tyler testified that he is comfortable in the foster father's care but he would also prefer to return to Mother. Like Greg, Tyler testified that he does not wish to be adopted.

At the conclusion of the final hearing, the trial court rendered an oral ruling. On September 24, 2020, the trial court entered a written order on DCS's petition to terminate Mother's parental rights. In its written order, the court found that DCS established all five alleged grounds for termination of Mother's rights. The trial court also determined that it was in the best interest of the children to terminate Mother's parental rights. As a result, it terminated Mother's parental rights to the children.

Mother timely appealed.

## II.  ISSUES PRESENTED

On appeal, Mother presents several issues for review, which we have condensed and reworded:

1.  Whether DCS established grounds to terminate Mother's parental rights;

2.  Whether it is in the best interest of the children to terminate Mother's parental rights; and

3.  Whether there is a "less restrictive alternative" to terminating Mother's parental rights.

For the reasons stated herein, we affirm the trial court's decision to terminate Mother's parental rights and remand.

## III.  STANDARDS IN TERMINATION CASES

The Due Process Clauses in the federal and state constitutions recognize a parent's fundamental right to the care and custody of his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016); *In re Braxton M.*, 531 S.W.3d 708, 718 (Tenn. Ct. App. 2017). It is one of the oldest judicially recognized liberty interests. *In re Carrington H.*, 483 S.W.3d at 521; *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Although a parent's right to the care and custody of his or her child is a fundamental right, it is not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

- 8 -

A party wishing to terminate the parental rights of another must prove two elements: (1) that there is at least one ground for termination; and (2) that terminating parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). To ensure a parent's fundamental liberty interest is adequately protected, certain procedural safeguards are afforded to parents in termination cases. *In re Carrington H.*, 483 S.W.3d at 522. One such safeguard is that the petitioner must prove both elements by clear and convincing evidence. *In re Carrington H.*, 483 S.W.3d at 522; *In re Dakota C.R.*, 404 S.W.3d 484, 496 (Tenn. Ct. App. 2012). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It must "eliminate[] any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010))

"Rule 13(d) of the Tennessee Rules of Appellate Procedure supplies the standard that governs an appellate court's review of a trial court's determination in a parental termination proceeding." *In re Neveah M.*, 614 S.W.3d 659, 673 (Tenn. 2020) (citing *In re Carrington H.*, 483 S.W.3d at 523-24). Pursuant to Rule 13(d), we review the trial court's factual findings *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. *Id.* at 674 (citing *In re Carrington H.*, 483 S.W.3d at 524). Conclusions of law are also reviewed *de novo* but with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524.

## IV.   DISCUSSION

### A.  Grounds for Termination

The initial step in a parental termination case is to determine whether the petitioner has established a ground for termination of the parent's rights. Tenn. Code Ann. § 36-1-113(c); *In re Gabriella D.*, 531 S.W.3d at 681. On appeal, this Court must review each ground for termination that was found by the trial court. *See In re Carrington H.*, 483 S.W.3d at 525-26. In this case, the trial court found that all five grounds alleged by DCS were proven by clear and convincing evidence. We shall review each ground in turn.

### 1.  Abandonment – Failure to Provide a Suitable Home

Tennessee Code Annotated section 36-1-113(g)(1) states that "abandonment," as defined in section 36-1-102, may serve as a potential ground for termination of parental rights. *See* Tenn. Code Ann. §§ 36-1-102(1)(A), -113(g)(1).[6]   Accordingly,

---

[6] The relevant portions of the Code in this case are cited according to how they appeared when DCS

"abandonment" can include a parent's failure to obtain and sustain a suitable home for the child. Section 36-1-102(1)(A)(ii) states that a parent has abandoned the child by failing to provide a suitable home when:

(a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of [DCS] or a licensed child-placing agency;

(b) The juvenile court found . . . that [DCS] or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, [DCS] or [the] agency made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . [has] not made reciprocal reasonable efforts to provide a suitable home and [has] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii)(a)-(c).

As stated above, to terminate a parent's rights under this definition of abandonment, the parent must have "failed to provide a suitable home . . . after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015). DCS makes "reasonable efforts" to assist a parent by utilizing its superior resources and training to help the parent find a suitable home. *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). To constitute "reasonable efforts," DCS must do "more than simply provid[e] parents with a list of service providers and sending them on their way." *Id.* (quoting *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 800-01 (Tenn. Ct. App. 2008), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533). DCS makes "reasonable efforts" when its efforts are equal to or greater than that of the parent. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). DCS must make these "reasonable efforts" for a four-month period following the removal of the child from the parent, *see id.*; *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016), but "the window during which DCS may satisfy its obligation to make reasonable efforts [is not limited] to the four-month period directly following" the removal

initiated this case in January 2020.

of the children. *In re H.S.*, No. M2019-00808-COA-R3-PT, 2020 WL 1428777, at *7 n.4 (Tenn. Ct. App. Mar. 20, 2020) (quoting *In re Jakob O.*, 2016 WL 7243674, at *13).

In regards to the parent's efforts, the parent must do more than provide adequate space for the child. *In re Matthew T.*, 2016 WL 1621076, at *7; *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). A parent must make efforts to provide adequate care and attention for the child. *In re Billy T.W.*, No. E2016-02298-COA-R3-PT, 2017 WL 4317656, at *7 (Tenn. Ct. App. Sept. 27, 2017). A suitable home is "free of drugs and domestic violence." *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). A parent fails to provide a suitable home if the parent lacks residential stability or lives a transient lifestyle. *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *7 (Tenn. Ct. App. Jan. 16, 2020) (citing *In re Seth B.*, No. E2017-00173-COA-R3-PT, 2017 WL 4082484, at *9 (Tenn. Ct. App. Sept. 14, 2017)). A parent is only required to make "reasonable efforts" to establish a suitable home; "successful results" are not required. *In re D.P.M.*, No. M2005-02183-COA-R3-PT, 2006 WL 2589938, at *10 (Tenn. Ct. App. Sept. 8, 2006).

In the present case, the children were last removed from Mother's custody on June 12, 2019. On this date, due to Mother's incarceration, the juvenile court entered an order that removed the children from Mother's custody and placed them into the custody of DCS. In the June 12 order, the juvenile court found that there was probable cause to show that the children were dependent and neglected due to Mother's unavailability and the children's educational neglect.[7] In its order, the juvenile court also found that DCS made reasonable efforts to prevent the children's removal. Mother was released from incarceration on June 21, nine days after the children were taken into the custody of DCS. To avoid further incarceration for subsequently failing drug screens, Mother "went on the run" in August 2019. There is clearly a four-month period following the removal of the children wherein DCS made reasonable efforts to assist Mother in establishing a suitable home. For the purposes of this case, we conclude that the applicable four-month period is from June 22, 2019—the date after Mother left incarceration in June 2019—to October 21, 2019. *See In re Jakob O.*, 2016 WL 7243674, at *13 (stating that "the proof necessary to support termination under this ground need not be limited to any particular four-month period after removal").[8]

---

[7] In February 2020, after DCS filed the termination petition, the juvenile court found by clear and convincing evidence that the children were dependent and neglected.

[8] In prior cases, this Court has stated that a parent's incarceration may prevent the parent from being able to make efforts to provide a suitable home and DCS's efforts to assist in providing a suitable home. *See, e.g.*, *In re Eli S.*, No. M2019-00974-COA-R3-PT, 2020 WL 1814895, at *11 (Tenn. Ct. App. Apr. 9, 2020); *In re Jamel H.*, 2015 WL 4197220, at *7. For this reason, the applicable four-month period in this case follows the children's removal from Mother's custody and spans a period during which Mother was not incarcerated. Although Mother was incarcerated for a four-day period in August 2019, we find that to be insignificant for the purposes of this ground. This period of four days would have neither thwarted any

During the relevant four-month period in this case, FSW Weitzel made numerous efforts to assist Mother in finding a suitable home. FSW Weitzel referred Mother to parenting classes, she arranged drug screens, she developed a family permanency plan, she conducted family meetings, she helped provide therapeutic visitation for Mother and the children, she arranged transportation assistance for Mother so that she could attend appointments with the Roane County Drug Court, she maintained contact with WestCare after Mother was admitted into the WestCare program, and even attempted several times to locate Mother while she was "on the run."

In contrast to the efforts made by FSW Weitzel, Mother did not make reasonable efforts to establish a suitable home during the applicable four-month period. Initially, Mother was compliant with the directives of WestCare and abstained from using illegal drugs. However, in July and August 2019, Mother missed appointments with WestCare and tested positive for several illegal substances. Additionally, during the four months after her release, Mother did not make efforts to locate housing. In fact, at one point, WestCare located an apartment for Mother. Yet, Mother declined to move into the apartment. Instead, Mother continued to live a transient and unstable lifestyle. Mother ceased all contact with DCS and WestCare when she "went on the run" in August 2019. She continued to evade the authorities until she was apprehended on October 29, 2019. Although Mother visited the children two times during the four months following her release and participated in family meetings, her efforts did not match those that were made by DCS and FSW Weitzel.

Despite the efforts made by DCS during the relevant four-month period, Mother failed to make reasonable efforts to provide a suitable home for the children. In fact, Mother's actions from the time of the children's removal until her subsequent incarceration demonstrated a lack of effort on her part to provide a suitable home for the children. More than four months transpired between her release on June 21 and her subsequent apprehension. During that time, her continued relationship with Scotty, continued use of illegal drugs, refusal of potential housing located by WestCare, and deliberate flight to avoid incarceration while living a transient lifestyle all reflected her lack of effort. At the time of trial, Mother admitted that she still was without suitable housing for the children. Although she had submitted housing applications, she remained on a three-month waiting list.

Mother's inability or unwillingness to provide a suitable home for the children demonstrates such a lack of concern for the children "that it appears unlikely that [she] will

---

efforts she was attempting to make nor diminished any efforts that DCS was making during that time. This interpretation is consistent with the statutory definition of "abandonment." Tenn. Code Ann. § 36-1-102(1)(A)(iv) (stating that "[p]eriods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration")

be able to provide a suitable home for the child[ren] at an early date." *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). The efforts made by DCS clearly exceeded those made by Mother. As a result, we affirm the trial court's ruling that Mother abandoned the children by failing to provide a suitable home. *See id.* §§ 36-1-102(1)(A)(ii), -113(g)(1).

### 2. Abandonment – Wanton Disregard

Tennessee Code Annotated section 36-1-102(1)(A)(iv) provides another definition of abandonment. As we have previously recognized, there are several "mechanisms by which abandonment may be proven" under subsection (1)(A)(iv). *In re Navada N.*, 498 S.W.3d at 597. Under this subsection, "abandonment" has occurred when:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2019).

"[U]nreasonably or maliciously risking harm while being utterly indifferent to the consequences" constitutes conduct that exhibits a wanton disregard for the welfare of a child. *In re O.W.*, No. W2019-01127-COA-R3-PT, 2020 WL 97727, at *5 (Tenn. Ct. App. Jan. 9, 2020) (quoting *In re Chandler M.*, No. M2013-02455-COA-R3-PT, 2014 WL 3586499, at *4 (Tenn. Ct. App. July 21, 2014)). "When considering whether a parent's criminal conduct constitutes wanton disregard, we consider 'the severity and frequency of the criminal acts.'" *In re Johnathan M.*, 591 S.W.3d 546, 555 (Tenn. Ct. App. 2019) (quoting *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014)). Repeated incarceration, criminal behavior, and substance abuse can constitute a wanton disregard for the welfare of a child. *In re Audrey S.*, 182 S.W.3d at 867-68.

DCS initiated this case on January 10, 2020. Therefore, the relevant four-month period for examining Mother's dates of incarceration under subsection (1)(A)(iv) is from September 10, 2019, to January 9, 2020. Mother was incarcerated from October 29 to December 9, 2019, which was within the relevant four-month period.[9] Therefore, section 36-1-102(1)(A)(iv) applies because Mother was incarcerated during part of the four months immediately preceding DCS filing its petition.

---

[9] Mother was also incarcerated for four days in August 2019. However, under section 36-1-102, a four-day period of incarceration is not counted as a period of incarceration. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv).

- 13 -

Prior to Mother's incarceration in October 2019, her conduct clearly exhibited a wanton disregard for the welfare of the children. Mother disregarded authorities by going "on the run" for several weeks. Mother went "on the run" after she tested positive for illicit substances and was informed that she faced incarceration until a treatment facility became available. Mother's decision to evade authorities continued her pattern of reverting back to a transient and chaotic lifestyle. Further, Mother visited the children only two times between leaving incarceration in June 2019 and reentering incarceration in October 2019. Mother's efforts to obtain housing by submitting applications began only after she was admitted into Abundant Hope in December 2019. Mother's "me first" attitude involved the intentional performance of illegal acts and drug use, exhibiting a clear indifference for the welfare of the children. *See In re Nevaeh B.*, No. E2019-01539-COA-R3-PT, 2020 WL 1527001, at *6 (Tenn. Ct. App. Mar. 31, 2020); *In re Audrey S.*, 182 S.W.3d at 867-68.

For these reasons, we affirm the trial court's determination that there is clear and convincing evidence to show that Mother abandoned the children under Tennessee Code Annotated section 36-1-102(1)(A)(iv). Mother was incarcerated during part of the four months immediately preceding the initiation of this case, and prior to her incarceration, Mother engaged in conduct that exhibited a wanton disregard for the welfare of the children.

### 3. Substantial Noncompliance with a Permanency Plan

Under Tennessee Code Annotated section 36-1-113(g)(2), a parent's rights may be terminated if "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Permanency plans are developed to help ensure that a child in foster care is cared for and the parent's responsibilities under the plan help serve the child's needs. *In re Jamel H.*, 2015 WL 4197220, at *7. In order to terminate a parent's parental rights under this ground, the parent's noncompliance with the plan must be substantial and the plan's requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002).

In determining whether a parent's noncompliance with a plan was substantial, the court must do more than "count[] up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537. DCS must show "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d at 548-59; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)).

In the present case, the trial court determined that Mother's actions exhibited

substantial noncompliance with the Family Permanency Plans that were drafted after the children last entered DCS custody. The first plan in the current custodial episode was drafted on July 10, 2019, and ratified by the trial court on August 8, 2019. The plan was revised on February 7, 2020. The revised plan amended many of the deadlines for Mother's responsibilities. Mother participated in the development of both the original and revised plan. Under these permanency plans, Mother was required to accomplish several tasks, including complete mental health and alcohol and drug assessments, submit to random drug screens, comply with the Roane County Drug Court, resolve her criminal charges and be compliant with the terms of her probation, comply with court orders, maintain a bond with the children through therapeutic visitation, provide proof of a residence, maintain a legal source of income, and provide a transportation plan to DCS. We find that these requirements were reasonable and related to remedying the conditions that necessitated foster placement of the children.

We now consider Mother's compliance. We begin with the requirement for Mother to complete mental health and alcohol and drug assessments. When tasked with completing previous permanency plans, Mother completed the required assessments. However, the permanency plans that were drafted during the current custodial episode required Mother to complete new assessments. FSW Weitzel testified that Mother completed new assessments once she was admitted to Abundant Hope but those assessments were not provided to DCS. Although Mother's recent assessments were not submitted to DCS, we conclude that Mother mostly met these requirements.

The next responsibilities listed in the permanency plans are for Mother to submit to random drug screens, be compliant with the Roane County Drug Court, resolve her criminal issues, and follow the terms of her probation. The Roane County Drug Court directed Mother to enter the WestCare treatment program. Initially, Mother was working to accomplish these requirements. In June and July 2019, after the children were removed from her custody, Mother submitted and passed random drug screens. During this time, Mother was also compliant with the WestCare program, completing assessments and attending appointments. However, her efforts were short-lived. Mother missed multiple appointments with WestCare in late July and August 2019. Then, on August 27, 2019, Mother tested positive for methamphetamine, Suboxone, and synthetic marijuana. WestCare informed Mother that she would need to be incarcerated until an inpatient rehabilitation center was found. Instead of following this directive, Mother "went on the run" and evaded authorities for several weeks. Mother's actions violated the terms of her probation, resulting in a new criminal charge. Taken together, we find that Mother substantially failed to comply with these requirements of the permanency plans.

In regard to Mother maintaining a bond with the children through therapeutic visitation, Mother failed to consistently visit the children prior to entering Abundant Hope. From when the children left Mother's custody in June 2019 to the initiation of this case in January 2020, Mother visited the children only two times. After entering Abundant Hope,

- 15 -

Mother began maintaining regular contact with DCS and the children. However, the vast majority of Mother's recent contacts and visits with the children occurred after the termination petition was filed.

Mother was also required to provide proof of a residence, obtain a legal source of income, and provide a transportation plan to DCS. Recently, Mother has made efforts to search for employment and housing. However, these efforts were made after DCS filed the termination petition. Prior to the termination petition being filed, Mother did not make efforts to obtain suitable housing. In contrast, she declined to move into an apartment that was located for her by WestCare. Rather than search for a suitable home or a legal income, Mother cut ties with DCS and WestCare for several weeks while evading incarceration. In regards to Mother's transportation, she did not provide a transportation plan to DCS until the day of trial. In addition to providing the plan at the eleventh hour, under the plan, Mother states that she will rely on public transportation, friends, and family members. Mother admitted that she does not have a car of her own. Although Mother has recently made efforts to accomplish these requirements, as of trial, Mother had not obtained a residence outside of Abundant Hope, a legal source of income, or suitable transportation.

We recognize that "[i]mprovement toward compliance should be considered in a parent's favor." *In re Valentine*, 79 S.W.3d at 549. Taken together, however, we conclude that Mother has failed to complete the vast majority of the requirements in the permanency plans. Mother had not completed any of the requirements prior to the termination petition being filed. Although Mother has recently begun to make progress on the requirements, Mother's efforts are "too little, too late." *See In re Bryson B.*, No. E2019-00729-COA-R3-PT, 2019 WL 6487241, at *8 (Tenn. Ct. App. Dec. 2, 2019); *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *6 (Tenn. Ct. App. Apr. 4, 2018) (stating that "a parent's efforts to comply with a permanency plan after the filing of a petition to terminate can be 'too little, too late'"); *In re Daymien T.*, 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016). "Because [Mother] failed to complete many requirements in the permanency plans prior to the filing of the termination petition and largely failed to complete [m]any of the [requirements] even by the time of trial," we agree with the trial court that Mother's noncompliance with the relevant permanency plans was substantial. *See In re Daymien T.*, 506 S.W.3d at 473.

### 4. Persistence of Conditions

"Persistence of conditions" may serve as a ground for termination of parental rights when:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

- 16 -

(i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect . . .;

(ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)-(iii).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Navada N.*, 498 S.W.3d at 605 (omission in original) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). When efforts made by DCS to help "improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000). In determining whether "conditions persist," courts may consider conditions that led to the child's removal as well as other conditions that are likely to subject the child to future abuse or neglect. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i); *In re Audrey S.*, 182 S.W.3d at 872.

The juvenile court removed the children from Mother's custody on June 12, 2019. On this date, the juvenile court entered an order that stated there was probable cause to believe that the children were dependent and neglected. The final hearing on the termination petition was held on August 13, 2020. Accordingly, the children were removed from Mother's custody for a period of at least six months before the final hearing was held. *See* Tenn. Code Ann. § 36-1-113(g)(3).

The children were removed from Mother's custody due to her unavailability based on her incarceration; her inability to transport the children to school, which caused the children educational neglect; and her drug use. Despite Mother's recent progress in the Abundant Hope program, many of these conditions persist. Mother continues to be unavailable in that, as of trial, she remained at Abundant Hope. Her only potential housing placed her on a one to three-month waiting list. Although she had refrained from using drugs for several months prior to trial, FSW Weitzel expressed concerns about Mother's

- 17 -

ability to remain sober when she leaves inpatient treatment. In the past, Mother has shown a pattern of becoming sober for a short period of time before an inevitable relapse. While Mother's efforts to maintain her sobriety are commendable, she has not exhibited an ability to refrain from drug use for a prolonged period of time outside of a controlled environment such as Abundant Hope. Further, as we have previously discussed, Mother is still without a reliable means of transporting the children. Without an ability to consistently transport the children, the children may be subject to additional educational truancy. Based on Mother's recent history, the conditions that led to the children entering DCS custody persist. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i).

Mother was given a significant period of time to remedy the conditions that led to the children's removal. Fourteen months elapsed between the children's removal and the final hearing before the trial court. Since the children last entered DCS custody, Mother has received assistance from WestCare, DCS via FSW Weitzel, and Abundant Hope. Considering the significant length of time that Mother was afforded, the amount of assistance that she was provided, and her lack of progress in remedying the conditions, there is little likelihood that these conditions will be remedied at an early date. *See id.* § 36-1-113(g)(3)(A)(ii).

Under subsection (iii), the continuation of Mother's relationship with the children would greatly diminish their chances of integrating in to a safe and stable home. *See id.* § 36-1-113(g)(3)(A)(iii). Unfortunately, this is not the first time that DCS has been involved with this family. The first DCS referral regarding the children was in 2006, and their first removal was in 2012.[10] Each period of custody ultimately resulted in reunification with Mother. Even when in Mother's custody, DCS had almost continuous contact with Mother's home, either due to continuing services or new referrals being made. As such, these children have rarely known a "safe and stable home" without DCS oversight. FSW Weitzel testified that Mother is clearly bonded with the children and that the children love Mother. She stated that the children are loyal to Mother but that they do not understand the history of this case. Still, she remains unable to provide essential care for the children. After the children were removed from Mother's custody, Greg and Tyler were placed in one foster home, while Reagan was placed in a separate foster home. It is undisputed that the children are doing exceptionally well in these homes. Mother lauded Greg and Tyler's foster father and recognized that he is providing them with exceptional care. Although Greg and Tyler expressed a desire to not be adopted, they testified that they are comfortable in the foster father's home. Further, the foster father stated that he would care for the boys as long as may be necessary. Although Reagan is not currently in a pre-adoptive foster home, she is also thriving in her placement. Reagan was twelve at the time of the termination hearing. She did not testify regarding her preference as to ultimately being adopted. Although the children are placed in separate homes, they regularly visit and

---

[10] We note that Greg was approximately three years old, Tyler was approximately one year old, and Reagan was not yet born at the time that DCS first became involved with this family.

maintain consistent contact.

Placement of the children in a pre-adoptive foster home is not required to find that the final element of this ground for termination has been met under Tennessee Code Annotated § 36-1-113(g)(3)(A)(iii).[11]   The children have lived in an incessant cycle of foster care for the majority of their lives.  As this Court has previously recognized, the "lack of finality in this matter is preventing [the children] from placement for adoption into a safe, stable, and permanent home." *In re L.J.C.,* 124 S.W.3d 609, 623 (Tenn. Ct. App. 2003).  The continuation of their relationship with Mother at this point greatly diminishes their chances of being a part of a "safe, stable, and permanent home" during their adolescence.  At the time of trial, Greg had not yet reached adulthood, and at the present time, Tyler and Reagan have yet to reach the age of majority.  The potential to be adopted into a permanent family has benefits for a child which may reach far past the age of majority.

For the above-stated reasons, we find that DCS satisfied the requirements of Tennessee Code Annotated section 36-1-113(g)(3).  Conditions that led to the children's removal from Mother's custody persist.  Therefore, "persistence of conditions" has been established as a ground for termination of Mother's parental rights.

### 5.  Failure to Manifest and Ability or Willingness to Parent

Tennessee Code Annotated section 36-1-113(g)(14) provides another potential ground for termination of parental rights.  Under subsection (g)(14), two elements must be established by clear and convincing evidence.  First, the petitioner must prove that the "parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." *In re Neveah M.*, 614 S.W.3d at 674.  Second, the petitioner must establish that "placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

Recently, the Tennessee Supreme Court in *In re Neveah M.* clarified the proper interpretation of the first requirement of this ground. *Id.* at 674-75.  The Court concluded that the first requirement places "a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677.  Meaning, in order to satisfy the initial requirement of section 36-1-113(g)(14), the petitioner must "prove[] by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> [an] ability or

---

[11] Previously, this court has repeatedly affirmed "persistence of conditions" as a ground for termination despite a child not being placed in a pre-adoptive home. *See, e.g.*, *In re Kayden A.*, No. W2020-00650-COA-R3-PT, 2021 WL 408860, at *2, *10 (Tenn. Ct. App. Feb. 5, 2021); *In re Bryson B.*, 2019 WL 6487241, at *5-6; *In re Jeffery B.*, No. W2012-00924-COA-R3-PT, 2012 WL 4854719, at *15, *18 (Tenn. Ct. App. Oct. 12, 2012).

willingness" to parent the child. *Id.*

Applying this standard to the present case, DCS established by clear and convincing evidence that Mother failed to express an ability and a willingness to assume custody or financial responsibility of the children. Mother's lifestyle has been chaotic and unstable, and it is interrupted only by momentary periods of sobriety. *See In In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (stating that a parent's ability to assume custody or financial responsibility is based on his or her "lifestyle and circumstances") (citing *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), *overruled on other grounds by In re Neveah M.*, 614 S.W.3d 659). Mother continues to be without a home or income to support the children. Further, while this Court commends Mother for her efforts to improve her circumstances by progressing through the Abundant Hope program, as of trial, she had not yet completed the program. Although Mother claims otherwise, there is no indication that Mother will maintain her sobriety once she leaves Abundant Hope's controlled and supportive environment. Accordingly, we find that Mother is not able to assume custody or responsibility of the children.[12]

Mother's criminal activity in 2019 also raises doubt as to her willingness to assume custody or financial responsibility of the children. *See In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018). After the children left Mother's custody, Mother reconnected with Scotty, tested positive for illicit substances, and ran from authorities. Mother's actions violated the terms of her probation and resulted in another stint of incarceration. Although Mother claims that she is willing to assume legal and physical custody of the children, her past actions indicate otherwise. *In re Eli H.*, No. E2019-01028-COA-R3-PT, 2020 WL 2300066, at *9 (Tenn. Ct. App. May 8, 2020) ("In assessing a parent's willingness, 'we look for more than mere words.'") (quoting *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019)). Taken together, it is evident that Mother has failed to manifest an ability or willingness to assume custody or financial responsibility of the children. Therefore, DCS has satisfied the first requirement in Tennessee Code Annotated section 36-1-113(g)(14).

Under the second prong of section 36-1-113(g)(14), we further find that returning the children to Mother's custody "would pose a risk of substantial harm" to the children. Although Mother has made some progress, she has not shown an ability to provide a home or necessary care for the children over a sustained period of time. In contrast, the children are doing well in their foster placements and have exhibited improvement in their

---

[12] Mother's inability to care for the children is shown, in part, by her own testimony. At trial, she testified that she is "primarily trying to get reunified" with Reagan because she believes that she "can handle one child" at the present time. Based on this statement, Mother seems to admit that she is not presently able to care for all of the children.

- 20 -

schooling, their behavior, and their emotional wellbeing. Considering the record as a whole, we agree with the trial court that returning the children to Mother poses a risk of substantial harm to the children.

We find that DCS has satisfied both prongs of Tennessee Code Annotated section 36-1-113(g)(14) by clear and convincing evidence. Therefore, we affirm the trial court's decision to terminate Mother's parental rights for her failure to manifest an ability or willingness to assume custody or financial responsibility of the children.

## B. Best Interests of the Children

DCS has established at least one ground for termination of Mother's parental rights under Tennessee Code Annotated section 36-1-113(g). Therefore, we must now determine whether termination of Mother's parental rights is in the best interest of the children. *See In re Navada N.*, 498 S.W.3d at 606 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). In making this determination, courts are instructed to consider the factors listed in Tennessee Code Annotated section 36-1-113(i).[13] *See In re Neveah M.*, 614

---

[13] At the time DCS filed its petition in January 2020, Tennessee Code Annotated section 36-1-113(i) included the following best interest factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

S.W.3d at 678-79. The relevancy and weight that a court places on each factor depends on the unique facts of each case. *In re Audrey S.*, 182 S.W.3d at 878. The best interest determination should be viewed from the perspective of the child; meaning, "when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Navada N.*, 498 S.W.3d at 607 (citing Tenn. Code Ann. § 36-1-101(d)). The relevant facts in a best interest analysis must be established by a preponderance of the evidence. *In re Gabriella D.*, 531 S.W.3d at 681 (quoting *In re Kaliyah S.*, 455 S.W.3d at 555). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* (alteration in original).

As we have previously discussed, Mother has not resolved several of the issues that caused the children to reenter DCS custody. As of trial, Mother was still without a home or employment and had not shown an ability to maintain her sobriety outside of an inpatient rehabilitation facility. Additionally, prior to entering Abundant Hope, Mother continued to use illicit drugs, lived a transient lifestyle, and evaded authorities in an effort to avoid incarceration. Mother should be commended for her recent efforts to refrain from further drug use and to establish residential stability. However, the majority of her efforts took place after DCS filed its termination petition. Despite her efforts, Mother continues to be unable to assume custody of the children. Mother's unresolved issues have persisted despite the ongoing support by DCS. Throughout DCS's involvement with Mother and the children, DCS has made extensive efforts to help Mother achieve residential stability, refrain from drug use, and maintain a bond with the children. Based on Mother's failure to make a sustained adjustment to the circumstances of her life, it is not safe or in the children's best interest to be in Mother's custody. Accordingly, factors (1) and (2) weigh in favor of termination.

Another panel of this court considered a factually similar situation in *In re Allyson P.*, No. E2019-01606-COA-R3-PT, 2020 WL 3317318 (Tenn. Ct. App. June 17, 2020). In that case, at the time of trial, the mother was residing in an in-patient rehabilitation program. *Id.* at *2. According to the mother, she was progressing through the program and would remain in the program for several additional months after trial. *Id.* at *3. The mother entered the program three weeks after DCS filed a petition to terminate her parental rights and approximately fifteen months after the child had entered DCS custody. *Id.* at *1, *3. Although the mother had not completed the in-patient program at the time of trial, in its best interest analysis, this Court credited the mother's efforts in the program and

_____

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

determined that it was not in the best interest of the child to terminate her parental rights. *Id.* at *14.

Similar to the panel in *In re Allyson P.*, we commend Mother for her efforts since she entered Abundant Hope. It appears that she has made some progress towards improving the circumstances of her life. However, we reach a different conclusion as to the ultimate best interest determination in this case. Although Mother has progressed through the initial stages of an in-patient rehabilitation program, as of trial, she had not completed the program and she had not obtained residential stability. Unlike the panel in *In re Allyson P.*, we cannot say that Mother currently being "on track" towards eliminating her addiction and residential concerns renders a conclusion that she has, at this point, made a lasting adjustment to her conduct or circumstances. While Mother has made progress, her conduct and current circumstances continue to make it unsafe for the children to return to her care.

Under factor (3), Mother only visited the children two times between them reentering DCS custody on June 12, 2019, and Mother reentering incarceration on October 29, 2019. Mother began consistently visiting and contacting the children *after* she entered Abundant Hope. In regards to the current custodial episode, the vast majority of Mother's visits with the children took place after DCS initiated this termination proceeding. As a result, factor (3) weighs in favor of terminating Mother's parental rights.

It is undisputed that Mother has a significant bond with the children. Mother, FSW Weitzel, and Greg and Tyler's foster father all testified that Mother has a meaningful relationship with the children. As we have previously explained, the children were ages 12, 15, and 17 at the time of the termination hearing. They have been in and out of Mother's custody since 2012. Although Greg and Tyler expressed a desire not to be adopted, this Court must review the combined weight of the factors regarding the children's best interest.[14] As our Supreme Court has explained, "the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *In re Gabriella D.*, 531 S.W.3d at 682. Although factor (4) weighs against termination, we find that this factor is outweighed by the gravity of the remaining factors.

All of the children are doing well in their current foster homes. Greg and Tyler have excelled in their foster father's home and have developed into respectful and bright young men. Both Greg and Tyler testified that they are comfortable in the care and custody of

---

[14] *See In re Raylan W.*, No. M2020-00102-COA-R3-PT, 2020 WL 4919797, at *20 (Tenn. Ct. App. Aug. 20, 2020) (stating that, although a parent's meaningful relationship with a child is "an important factor" in a best interest analysis, "we must determine the best interests of each child before this Court on 'a case-by-case basis'"); *In re Briana H.*, No. M2017-02296-COA-R3-PT, 2018 WL 4191227, at *14 (Tenn. Ct. App. Aug. 31, 2018) (stating that "[t]he existence of a meaningful relationship between the parent and the child . . . does [not] foreclose the possibility that termination is in the child's best interests even where a meaningful relationship exists between the parent and the child").

their foster father. Mother additionally testified that she would be comfortable with the boys remaining with their foster father if she can maintain contact with them. Similarly, Reagan is thriving in her current foster placement. She is performing well in school, is well behaved, and gets along with her foster family. Additionally, since entering DCS custody, the children have been able to receive valuable therapy and support. Although Reagan is placed in a separate home, she visits and maintains regular contact with Greg and Tyler. Considering the positive nature of the children's current placements, a change of caretakers or physical environment is likely to have a detrimental effect on their wellbeing. Factor (5) weighs in favor of termination.

Although there was no evidence to show that the children have suffered physical abuse, there was evidence that indicates Mother neglected the children when they were in her care. Mother was incarcerated when the children were removed from her custody. The children were also removed from Mother's custody, in part, because of her inability to transport them to school and to necessary appointments. Mother's inability to transport the children led to their educational neglect. Further, Greg testified that, on previous occasions, Mother was "strung out on drugs" while the children were in her custody. Mother's incarceration, drug use, and lack of transportation resulted in the children receiving improper care while they were in her custody. As such, factor (6) weighs in favor of termination.

Under factor (7), Mother is still without a home for the children. The last time she was not incarcerated or in a rehabilitation facility, she was evading authorities and using illicit substances. Assuming Mother is able to obtain a residence after leaving Abundant Hope, there is no proof to indicate that she will be able to provide a safe and stable home for the children. Mother's drug use and previous criminal activity has left her unable to provide a home or proper care for the children. Factor (7) weighs in favor of termination.

On appeal, DCS concedes that there is no evidence regarding Mother's mental state (other than her drug addiction) or child support. The lack of evidence on factors (8) and (9) is not a critical omission in this case. Courts are not required "to find the existence of each factor before" concluding that terminating parental rights is in the best interest of the child. *In re Matthew T.*, 2016 WL 1621076, at *16 (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)).

Taken together, after considering all of the applicable factors from the perspective of the children, we find that it is in the best interest of the children to terminate Mother's parental rights.

## C. "Less Restrictive Alternative"

Mother also claims that the trial court should have considered a "less restrictive alternative" to terminating her parental rights. In support of this argument, Mother cites

Tennessee Code Annotated sections 37-1-802 and -803, statutes that control the effect and selection of a permanent guardianship. In particular, Mother argues that under section 37-1-802(e), the trial court should have considered Greg and Tyler's testimony on wanting to return to Mother's care. These sections are *not* at issue in this case. Additionally, a child's preference of caretakers is *not* a standalone factor for consideration in a termination case. *See* Tenn. Code Ann. § 36-1-113(g), (i).

Mother's argument that there is a "less restrictive alternative" to terminating her rights exhibits a flawed application or understanding of the law in termination cases. In such cases, although prolonging termination may aid the parent in making changes to his or her life, it is not the court's role to find an alternative to termination. Instead, the court is tasked with making two determinations: (1) whether the petitioner has established a ground for termination and (2) determine whether termination is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d at 552. A "less restrictive alternative" to termination is *not* part of a court's analysis in parental termination cases. Any argument to the contrary is baseless.

Because this issue is not applicable in this case, Mother's "less restrictive alternative" argument shall not be discussed further herein.

## V. CONCLUSION

Based on the foregoing discussion, we affirm the trial court's findings that all five alleged grounds for termination have been proven by clear and convincing evidence. We also affirm the finding that it is in the best interest of the children to terminate Mother's parental rights. As a result, we affirm the trial court's order to terminate Mother's parental rights to the children.

This case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against Appellant, Jennifer L., for which execution may issue, if necessary.

_____
CARMA DENNIS MCGEE, JUDGE